UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DYLAN DONALD TALLMAN,

                    Plaintiff,

          v.                                    Case No. 22-cv-994-pp

CHERYL JEANPIERRE,

                    Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 17) AND DISMISSING CASE**

Plaintiff Dylan Donald Tallman, who is representing himself, is proceeding under 42 U.S.C. §1983 on federal and state law claims against a doctor at Dodge Correctional Institution. The defendant has moved for summary judgment. Dkt. No. 17. The court finds that the defendant is entitled to judgment as a matter of law and will grant her motion and dismiss the case.

**I.     Facts**

        A.     Procedural Background

On August 29, 2022, the court received the plaintiff's complaint asserting claims against Dr. Cheryl Jeanpierre, a doctor who worked at Dodge. Dkt. No. 1. On October 31, 2022, the court screened the complaint and allowed the plaintiff to proceed against Dr. Jeanpierre on federal and state law claims. Dkt. No. 9. After Dr. Jeanpierre answered the complaint (Dkt. No. 12), the court issued a scheduling order setting deadlines for the parties to compete discovery and file dispositive motions. Dkt. No. 13. Neither party filed any motions or

requests during discovery, though the plaintiff twice notified the court that he had been transferred to the Wisconsin Resource Center. Dkt. No. 14, 16.

On July 5, 2023, the defendant filed her motion for summary judgment. Dkt. No. 17. Two days later, the court received a flash drive containing video exhibits in support of that motion. Dkt. No. 24. Defense counsel also filed a letter notifying the court that he had served the motion and all supporting documents and exhibits on the plaintiff at the Wisconsin Resource Center, where counsel "understood [the plaintiff] to be currently incarcerated." Dkt. No. 22. Counsel explained, however, that since filing the summary judgment motion, he had received notice that the plaintiff had been released to extended supervision. Id. Counsel did not have the plaintiff's current address but advised the court that he would "forward copies of all documents to [the plaintiff] once he updates his new address with the court." Id.

On July 7, 2023, the court ordered that by the end of the day on August 4, 2023, the plaintiff must respond to the defendant's motion. Dkt. No. 25. The court sent that order to the plaintiff at the Wisconsin Resource Center because that was the last address he had provided to the court. The order was not returned to the court as undeliverable. The August 4, 2023 deadline passed, and the plaintiff did not file a response or ask the court for more time to do so. But on September 1, 2023, the court received from the plaintiff a motion for an extension of time to file his summary judgment response and a notice that he was incarcerated at the Marathon County Jail. Dkt. No. 26. The court granted that motion and ordered the plaintiff to respond to the defendant's summary

judgment motion by October 6, 2023. Dkt. No. 27. On October 10, 2023, the court received the plaintiff's response materials (they are dated October 4, 2023). Dkt. Nos. 28–30.

B.    Factual Background

The plaintiff filed a brief in opposition to the defendant's motion for summary judgment (Dkt. No. 28) and a response to the defendant's proposed findings of fact (Dkt. No. 29). But the clerk's office accidentally filed two pages of the brief in the plaintiff's proposed findings of fact. Dkt. No. 29 at 3–4. The court has corrected that error and considers all pages of the brief together, as well as the plaintiff's proposed findings of fact, in deciding the summary judgment motion.

The plaintiff responded to the defendant's proposed facts, but he did not support all his factual disagreements by citing to evidence in the record. Dkt. No. 29. In several places he wrote only "Deny" before stating why he disagreed with the proposed fact. See, e.g., id. at ¶¶1, 10, 17. The plaintiff's failure to support his disagreements with the defendant's proposed facts by citing evidence in the record violates the court's scheduling order and its Local Rules. See Civil Local Rule 56(b)(2)(B) (E.D. Wis.). Where the plaintiff fails to cite evidence in support of a factual dispute, the court will deem the fact admitted for purposes of its decision. See Civil L.R. 56(b)(4); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). That means the court will consider the defendant's undisputed facts to be true, so long as the defendant has

supported them by citing evidence in the record. <u>See</u> Federal Rule of Civil Procedure 56(e)(2).

1. *The Complaint*

The complaint[1] alleges that on July 24, 2020, while the plaintiff was incarcerated at Dodge Correctional Institution, he saw Dr. Jeanpierre for medical treatment for staples that were "all the way through" four of his fingers. Dkt. No. 1 at 2. He alleged that as she was treating him, Dr. Jeanpierre rubbed his hand and made various inappropriate comments, such as calling him "pretty brown eyes," telling him to look at her and commenting on his "nice muscles." <u>Id.</u> The plaintiff alleged that these comments made him feel humiliated and uncomfortable. <u>Id.</u> He alleged that Dr. Jeanpierre eventually ordered prison staff to return the plaintiff to his cell without treating his stapled fingers. <u>Id.</u> The plaintiff said that he removed the staples himself because he did not want to endure more of Dr. Jeanpierre's comments and touching. <u>Id.</u>

In its screening order, the court analyzed these allegations under the Eighth Amendment, concluding that the complaint suggested that "Jeanpierre was attempting to humiliate the plaintiff or satisfy her sexual desires with her words and actions" when she provided him medical treatment in July 2020.

---

[1] The complaint was not verified. <u>See</u> 28 U.S.C. §1746; <u>Bell v. Beller</u>, 847 F.3d 897, 901 (7th Cir. 2017) (a verified complaint "is the equivalent of an affidavit for the purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion,'" <u>quoting</u> <u>Ford v. Wilson</u>, 90 F.3d 245, 246 (7th Cir. 1996)).

4

Dkt. No. 9 at 6. The court also observed that the plaintiff had filed a supplemental document in which he had asserted that he was a pretrial detainee—not yet convicted of a crime—at the time of the events. Id. at 6–7 (citing Dkt. No. 8). The court found that the plaintiff's allegations also satisfied "the standard for a claim under the Fourteenth Amendment, which requires only a showing that a prison official's conduct was objectively unreasonable." Id. at 7 (citing Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015); and Hardeman v. Curran, 933 F.3d 816, 821–22 (7th Cir. 2019)). The court ordered the parties to "address the proper standard applicable to the plaintiff's claims in dispositive motion practice or at trial, if necessary." Id. The court exercised supplemental jurisdiction over state law claims that Dr. Jeanpierre's failure to treat the plaintiff's injuries constituted negligence and/or medical malpractice. Id.

## 2. *Defendant's Proposed Facts*

The defendant says that the plaintiff "is an inmate in the custody of the State of Wisconsin Department of Corrections" and was incarcerated at Dodge at all relevant times. Dkt. No. 19 at ¶1. Dr. Jeanpierre worked full-time at Dodge from June 2019 through April 2021; she retired on August 30, 2022. Id. at ¶2. She has been a licensed Doctor of Osteopathic Medicine since 1995. Id. at ¶3. As a physician in the Wisconsin Department of Corrections, she attended to the medical needs of incarcerated persons, diagnosed and treated their illnesses and injuries and arranged for professional consultation. Id. at ¶4.

On July 24, 2020, Sergeant Michael Westphal (not a defendant) wrote an incident report about events that occurred at around 3:02 a.m. Id. ¶5; Dkt. No. 21-5. The incident report noted that Sergeant Westphal was conducting rounds and passed the plaintiff's cell, when the plaintiff appeared and asked to speak with him. Dkt. No. 21-5 at 1. The plaintiff told Sergeant Westphal that he "stuck some staples in [his] hand and [he] just can't deal with this shit." Id. The plaintiff showed the sergeant his hand, which had "four puncture wounds with what appeared to be metal staple pieces sticking out of them." Id. The plaintiff was not bleeding, "but the wounds were evident." Id. Sergeant Westphal returned to his desk and called a lieutenant for assistance; the lieutenant arrived with escort officers to take the plaintiff to observation status. Id.

At 3:41 a.m., the plaintiff saw Nurse Wendlandt (not a defendant) in the Health Services Unit (HSU) to address the staples in the plaintiff's fingers. Dkt. No. 21-1 at 9–10. The plaintiff allowed the nurse to clean his hand and fingers "but refused to have [the staples] removed." Id. at 10. Prison staff sent the plaintiff to Waupun Memorial Hospital emergency room for evaluation and removal of the staples. Dkt. No. 19 at ¶6. At 5:05 a.m., a nurse from the emergency room called the HSU to report that the plaintiff had refused treatment and that the hospital would be returning him to Dodge. Dkt. No. 21-1 at 17. At 6:05 a.m., after the plaintiff's return from the hospital, Nurse Wendlandt again saw the plaintiff. Id. at 9, 21. He refused pain medication and would not allow the nurse to remove the staples. Id.

At 6:30 a.m., Nurse Ann M. Mueller (not a defendant) saw the plaintiff in the Restricted Housing Unit, where the plaintiff had been sent following his refusal of medical treatment. Id. at 17. The plaintiff allowed Nurse Mueller to assess the staples in his fingers, but he complained that she was hurting his hand. Id. He told the nurse "that he [was] not going to allow [her] to remove staples." Id. Dr. Jeanpierre was with Nurse Mueller during the evaluation. Id. Nurse Mueller's note says that Dr. Jeanpierre "attempted to also assess and remove staples but [the plaintiff] would not allow her to do either." Id. The plaintiff requested his "court ordered meds," but Nurse Mueller told the plaintiff that he did not have any court-ordered medication or any medication that was due. Id. The plaintiff accused Nurse Mueller "of holding meds intentionally," and Nurse Mueller told security that they could return the plaintiff to his cell. Id.

Dr. Jeanpierre filed a separate progress note about the incident, reporting that she had been "asked to see this inmate for self-inserted staples . . . one staple had been at the base of each digit." Id. at 18. Dr. Jeanpierre stated that she examined the plaintiff's right hand, which "was significant for small staples without any evidence of cellulitis" or active bleeding. Id. at 19. She recounted that the plaintiff "would not allow [her] to remove them." Id. Dr. Jeanpierre wrote that the HSU would "monitor and follow up for infection." Id.

In his response to the defendant's proposed facts, the plaintiff says that he "was uncomfortable with doctors manner" during this evaluation, and he says he "kept refusing while being touched." Dkt. No. 29 at ¶10. He asserts

7

that the nurse "'refused' his medication due to it being late." Id. at ¶11. He identifies no record evidence to support these assertions.

Correctional Officer Shy Medrano (not a defendant) wrote a second incident report July 24, 2020 for an event that occurred at 8:10 a.m. Dkt. No. 21-6. Officer Medrano wrote that while he was sitting in front of the plaintiff's cell, the plaintiff told Medrano that "he was going to remove the staples himself." Id. at 2. The officer "collected each staple as [the plaintiff] removed them one by one from his fingers." Id. The plaintiff then asked to see a nurse, and Medrano informed a sergeant and shift supervisor who arrived and took the plaintiff to the HSU. Id.

At 8:30 a.m., Nurse Renee Schueler (not a defendant) saw the plaintiff to treat his fingers where he had removed the staples. Dkt. No. 21-1 at 2. She reported that he had a "pinpoint spot of blood at each site anterior and posterior digit" where the staples had been, but that he was not actively bleeding. Id. The plaintiff complained that he could not move two of his fingers, but Nurse Schueler stated that "he moved them without difficulty while wounds were being cleansed." Id. at 3.

### 3. *The Plaintiff's Declaration*

The plaintiff filed a declaration in opposition to the motion for summary judgment. Dkt. No. 30. The plaintiff concedes that he harmed himself with the staples and refused treatment from Dodge and hospital staff on July 24, 2020. Id. at ¶2. He avers that he "felt uncomfortable" when he saw Dr. Jeanpierre because of "her manner." Id. at ¶4. He avers that "her comments and touching

and grabbing were humiliating." Id. He avers, as he did in his complaint, that Dr. Jeanpierre "called [him] 'pretty brown eyes' several times." Id. at ¶5. He says she "rubbed and squeezed [his] bicept [*sic*] and said 'eww, nice muscles.'" Id. at ¶6. He avers that she "kept touching and rubbing irrelevant body parts and not focusing on the issue at hand." Id. at ¶7.

The plaintiff avers that Dr. Jeanpierre "was suspended 5-days without pay as a result of her actions." Id. at ¶8. He says that she "then dismissed [him] when [he] refused treatment to escape being sexually assaulted further." Id. at ¶9. He says he removed the staples himself "to avoid further humiliation by Doctor."[2] Id. at ¶10.

In his response to the defendant's proposed findings of fact, the plaintiff argues that Dr. Jeanpierre intended to humiliate him or gratify her sexual desires, quoting Washington v. Hively, 695 F.3d 641, 642 (7th Cir. 2012) and Gillis v. Pollard, 554 Fed. App'x 502, 505 (7th Cir. 2014). Dkt. No. 29 at ¶17, page 3.

4.   *Video Exhibits*

The defendant submitted three electronic exhibits of body worn camera (BWC) footage from July 24, 2020. Dkt. Nos. 21-2 (Ex. 1001), 21-3 (Ex. 1002), 21-4 (Ex. 1003).

---

[2] The plaintiff does not identify any record evidence in support of his statement that Dr. Jeanpierre was suspended for five days because of her conduct during the July 24, 2020 examination. There is no evidence in the record confirming that statement.

a. Ex. 1001 – Video of Body Worn Camera of
Adam Tank

Exhibit 1001 is taken from the BWC of Adam Tank, who the court infers is a correctional officer at Dodge. The video begins with officers walking the plaintiff down a hall. He is wearing what the court believes is a suicide smock or suicide blanket given to incarcerated persons whom the prison believes are at risk for self-harm or suicide. The officers pass an unidentified woman, who says "Hi, Dylan" to the plaintiff as they pass her. Ex. 1001 at 0:08–0:09. The officers guide the plaintiff into a seat in a small room, where a woman is standing wearing a medical facemask. Id. at 0:09–0:15. The court infers from the other evidence in the record that this is Nurse Mueller. Mueller asks to see the plaintiff's hand and examines it by turning it over slowly. Id. at 0:20–1:31. The staple pieces are not visible on the camera, but the nurse examines the plaintiff's fingers and notes that he has pieces in four of them. Id. The plaintiff initially allows Nurse Mueller to examine his hand but then recoils and says, "You're hurting me" in a flat voice. Id. at 0:23–0:35. He again allows the nurse to rotate and examine his hands. Id. at 0:38–0:58. A voice off-camera asks, "How'd you ever get 'em in there?" Id. at 0:58. The plaintiff calmly responds, "Uh, it took a long time." Id. at 1:01. At 1:43, the nurse shows the plaintiff an individually wrapped medical kit that appears to include tweezers and gauze. The plaintiff immediately but calmly says, "Nope, I'm not doing it," and waves off the nurse with his right (uninjured) hand. Id. at 1:43–1:48.

Another woman walks in front of the camera, wheels a stool in front of the plaintiff and sits down. Id. at 1:51–1:59. As she does, she says, "I'm Dr.

Jeanpierre." Id. This is the same woman who earlier said "Hi, Dylan" as the plaintiff walked into the examination room. Dr. Jeanpierre asks to see the plaintiff's fingers, but he retracts his hands and holds them in his lap. Id. at 2:00–2:02. She reaches her left hand towards the plaintiff's forehead and rubs in a short, downward motion a few times with her index finger. Id. at 2:02–2:04. The plaintiff repeats, "No." Id. She attempts to pull his left hand (the one with the staples) out from his lap by his wrist and tells him, "It will take two seconds." Id. at 2:04–2:09. She wheels her stool to the plaintiff's left side and tells him that he can't leave the staples in because "of the infec--umm, there's all [this] shit on the floor." Id. at 2:09–2:18. The plaintiff tells Dr. Jeanpierre that he would rather leave them in to get infected, to which one of the officers says, "It would be way worse." Id. at 2:17–2:23.

At 2:23, Dr. Jeanpierre says, "Dylan, look at me." She moves her left hand from the plaintiff's wrist to the right side of his jaw and turns his head to face her. Id. at 2:23–2:29. The plaintiff's eyebrows raise, and he says, "Hey, I-I-am not . . ." before trailing off. Id. at 2:26–2:28. She gently rubs his facial hair and says, "Hey, pretty brown eyes." Id. at 2:28–2:29. She moves her hand back to the plaintiff's left wrist and says, "Let me do this. Come on." Id. at 2:29–2:33. The plaintiff looks back down at his hands, up at Dr. Jeanpierre and then back down again. Id. She tells the plaintiff that he can look at her while she removes the staples, and the plaintiff appears mildly defeated as he says, "Hey, I cannot." Id. at 2:33–2:39. Dr. Jeanpierre moves her hand back to the plaintiff's jaw, again rubs or scratches at his facial hair and repeats, "Pretty brown eyes."

Id. at 2:39–2:43. She then grabs at the plaintiff's left arm and says, "Look at these biceps, too. Yeah, you've been working out." Id. at 2:43–2:47. The plaintiff smiles slightly, chuckles and says, "It's not going to work." Id. Dr. Jeanpierre continues to rub the plaintiff's face, ask him to look at her and hold his left wrist. Id. at 2:47–3:02. She says, "Come on, you're a big guy. . . . Is this how you want to start your day?" Id. at 2:49–3:04. The plaintiff says, "Yes. I've started my whole night." Id. at 3:04–3:07.

Dr. Jeanpierre continues to touch the plaintiff's face and tell him to look at her. Id. at 3:11–3:32. She repeats, "Come on, pretty brown eyes boy." Id. at 3:16. At one point, she rubs her fingers along a faded tattoo on the plaintiff's left forearm and asks what it means. Id. at 3:27. The plaintiff mumbles, "Old." Id. at 3:28. The plaintiff briefly allows Dr. Jeanpierre to flip over his injured hand before immediately pulling it back into his other hand. Id. at 3:34–3:38. He says, "Nope" and clasps his injured hand with his other one. Id. At 3:40, the plaintiff deeply inhales, sighs and says, "I'm not doing it. I refuse. I refuse medical care. Sorry." Id. at 3:40–3:47. Dr. Jeanpierre continues to plead with the plaintiff, asking him to hold her hand. Id. at 3:58–4:05. The plaintiff says, still calmly, "It hurts" and "It's a trick . . . . You're trying to trick me. You're hurting me." Id. at 4:05–4:27. He moves his left hand from inside his right hand and tucks it against his side, between his torso and his right arm. Id. at 4:27–4:33. Dr. Jeanpierre moves her hand to the plaintiff's right hand, rubs his fingers and says, "Your fingers are cold!" Id. at 4:28–4:35. She asks about another tattoo on the plaintiff's right hand, and he responds with inaudible

Case 2:22-cv-00994-PP   Filed 11/29/23   Page 12 of 36   Document 33

mumbling before saying, "Look, listen, learn . . . like: Look, listen, learn, I'm not going to do medical care." Id. at 4:37–4:52. The officers say, "OK. You're going to refuse medical care, then we'll get you back in the [inaudible]." Id. at 4:53–4:57.

Dr. Jeanpierre asks if they can "do one more time" and promises the plaintiff that there is no "trick." Id. at 4:57–5:05. The plaintiff pulls his left hand from the side of his body and allows Dr. Jeanpierre and the nurse to hold and examine it. Id. at 5:05–5:17. Dr. Jeanpierre leans in to get a closer look at the plaintiff's hand. Id. She points at the space around his third finger and says, "I would like to take that one out." Id. at 5:16. The plaintiff repeats, "Nope," closes his fingers into his hand and pulls his hand into his body. Id. at 5:17–5:21. Dr. Jeanpierre asks, "Are you sure?" Id. The plaintiff nods his head and sighs, "Yeah. They'll stay" Id. at 5:21–5:23. Dr. Jeanpierre and the nurse say, "OK," and they pull away from the plaintiff. Id. The plaintiff asks something about how long they will stay in, and Dr. Jeanpierre says, "For the whole weekend 'cause I'm not here on the weekend, honey." Id. at 5:25–5:28. The plaintiff nods and says, "OK." Id. at 5:29.

The plaintiff begins to stand to leave but turns back to the nurse and Dr. Jeanpierre and says, "What about my medicine? It's like, court ordered." Id. at 5:29–5:37. The nurse assures the plaintiff that his medication is not court ordered, but he points and stares at her and says, somewhat more loudly, "Yes they are court-ordered." Id. at 5:37–5:39. The nurse tells the plaintiff she will discuss them with him and that he should go to his cell. Id. at 5:40–5:42. The

plaintiff gets up to leave, and as he walks out he says, "You denied me court-ordered medication. It's a violation of my . . . my, my civil rights." Id. at 5:42–5:52. The officers escort the plaintiff to a nearby cell. Id. at 5:52–5:58. The plaintiff continues to talk about being denied his medicine and says, "Now they fucked up." Id. at 6:02–6:04. The officers remove Velcro restraints around the plaintiff's ankles and midsection, lock the cell and leave. Id. at 6:04–6:35.

> b.    Exhibit 1002 – Video of Body Worn Camera of
>       Cole Gilmore

Exhibit 1002 shows the same events as Exhibit 1001 but from behind the plaintiff's right shoulder, rather than from in front and to the right of the plaintiff. The court will not detail what this video shows because it is the same as what the viewer sees on Exhibit 1001. The court notes that during the examination, Dr. Jeanpierre can be seen making or attempting to make frequent eye contact with the plaintiff. After the appointment, Officer Gilmore removes the plaintiff's handcuffs through the food trap of the holding cell door. Otherwise, this video adds nothing new or different from Exhibit 1001.

> c.    Exhibit 1003 – Video of Body Worn Camera of
>       Lt. Audie Ritschke

The video in Exhibit 1003 begins earlier and shows the officers removing the plaintiff from his cell and placing his restraints before taking him for his medical evaluation with Nurse Mueller and Dr. Jeanpierre. Ex. 1003 at 0:00–1:10. Dr. Jeanpierre can be heard in the background engaging in small talk with Nurse Mueller. Id. The viewpoint of this officer during the examination is from the threshold of the room looking in. This video shows the same events,

but it is harder to hear the plaintiff and Dr. Jeanpierre because the lieutenant with the BWC is standing farther away.

After the appointment ends and the officers escort the plaintiff from the examination room, Dr. Jeanpierre walks up to Lieutenant Ritschke (who is wearing the BWC) and tells him in an irritated tone, "Next time I'm walking down the hall, don't call me in there, ok? Got it?" Id. at 7:00–7:03. She asks for the lieutenant's name and leans in to look at his name tag. Id. at 7:03–7:05. The lieutenant responds in a muffled or quiet voice, "Easy with the 'pretty brown eye' stuff, just so he doesn't mistake that as PREA or something like that." Id. at 7:05–7:11. Dr. Jeanpierre says, "What?" and leans in towards the lieutenant. Id. He repeats, "Easy with the 'pretty brown eye' stuff and, and, and touching the face and stuff like that, alright?" Id. at 7:11–7:15. He waves a gloved hand in front of his face in a "cut that out" type of gesture as he says this. Id. Dr. Jeanpierre says, "Oh! Ok, I didn't know that. Ok, alright. Sorry!" Id. at 7:12–7:18. The lieutenant responds, "Thank you" as he walks away and to the cell where the other officers are removing the plaintiff's restraints. Id. at 7:18–7:21. The lieutenant tells the plaintiff he will be placed in an observation cell later. Id. at 7:31–7:36.

### 5. Dr. Jeanpierre's Response to the Videos

Dr. Jeanpierre avers that she was aware on July 24, 2020 that the plaintiff has a history of self-harming. Dkt. No. 20 at ¶14. She avers that it was in the plaintiff's "best interest to have the staples removed and the wounds he created by the self-inflicted staples treated to prevent any damage or infection."

Id. at ¶16. She avers that incarcerated persons "have the right to refuse medical treatment," as the plaintiff did on July 24, 2020. Id. at ¶17. She avers that if a patient refuses treatment, medical staff may "attempt to monitor him to the extent he would allow."[3] Id.

Dr. Jeanpierre avers that her "interactions with [the plaintiff] on July 24, 2020 as depicted on the security officer's body worn camera video were an attempt to soothe him, calm him down, establish empathy, and gain his trust so he would consent to having the staples removed." Id. at ¶18. She says, "None of [her] words or actions during [her] visit with [the plaintiff] on July 24, 2020 were meant to humiliate him, nor were they done for any sexual purpose." Id. at ¶19. She reiterates that her "words or actions during [her] visit with [the plaintiff] on July 24, 2020 was [*sic*] solely to try to build report [*sic*] with him and give him confidence to consent to treatment." Id. at ¶20.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if she shows that there is no genuine dispute as to any material fact and she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material

_____

[3] The plaintiff asserts that incarcerated persons "do not have the right to refuse medical attention especially one with spikes all the way through his hand." Dkt. No. 29 at ¶17. He identifies no record evidence to support this statement, which his medical records and the video evidence contradict.

fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat the motion for summary judgment, the plaintiff must show that sufficient evidence exists that would allow a jury to return a verdict in his favor if the case proceeded to trial. See Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.    The Plaintiff's Status on July 24, 2020

In its screening order, the court observed that the complaint does not make clear whether the plaintiff was a convicted person or a pretrial detainee in July 2020, when the above events occurred. The court explained that "this distinction matters because the Eighth Amendment protects convicted persons from cruel and unusual punishment, but the Fourteenth Amendment protects pretrial detainees from similar mistreatment." Dkt. No. 9 at 5. (citing Case No. 20-cv-1191-JPS, Dkt. No. 13 at 4, n.2). At the screening stage, the court analyzed the plaintiff's claims under the stricter standard of the Eighth Amendment but found that the complaint also stated a claim under the Fourteenth Amendment. Id. at 4–7.

The court ordered the parties to "address the proper standard applicable to the plaintiff's claims in dispositive motion practice." Id. at 7. The defendant does not mention the court's order and merely discusses the plaintiff's claim

under the Eighth Amendment without explaining why that standard applies. Dkt. No. 18 at 2–4. The defendant mentions the Fourteenth Amendment only in passing, noting that the Eighth Amendment was "made applicable to the states by the Fourteenth Amendment." Id. at 2. Her proposed findings of fact state—without elaboration—that the plaintiff "is an inmate in the custody of the State of Wisconsin Department of Corrections." Dkt. No. 19 at ¶1. The plaintiff disputes that statement and says that he "was just housed at Dodge as a pre-trial detainee in custody of Department of Community Corrections." Dkt. No. 29 at ¶1. In his response brief he says that his claim is proceeding under the Fourteenth Amendment, "which is a less stringent standard for an 8th Amendment claim." Dkt. No. 28 at 2; see also Dkt. No. 8. The plaintiff identifies no record evidence proving his status in July 2020. These responses do not make clear which standard the court must apply to the plaintiff's claims.

According to the Wisconsin Department of Corrections Offender Detail website, the plaintiff was incarcerated at Columbia Correctional Institution on January 31, 2017, and he went back and forth to a "Supervised Living Facility" until November 26, 2017. See https://appsdoc.wi.gov/lop/home/home (DOC #504789). On September 19, 2018, he was transferred to New Lisbon Correctional Institution, and again went back and forth between that prison and a supervised living facility for about ten days, then stayed consistently at New Lisbon. Id. He was transferred back to Columbia on October 12, 2018, where he remained until his release to extended supervision on March 26, 2019. Id. On July 8, 2019, he was admitted to Dodge Correctional Institution

on a DCC (Department of Community Corrections) hold from the Marathon County Jail. Id. He then went between Dodge and the Marathon County Jail or a supervised living facility from July 8, 2019 until August 20, 2020. Id. This is the period relevant to the events described in the complaint.

The Wisconsin Circuit Court Access website shows that on January 9, 2017, the plaintiff pleaded no contest to misdemeanor and felony charges and was sentenced to one year incarceration and one year of extended supervision on each, "to run concurrent to each other and to all other sentences [the plaintiff] now serving." State v. Tallman, Case Number 2016CF415 (Marathon County Circuit Court), available at https://wcca.wicourts.gov/case.html. The next criminal complaint against the plaintiff was filed in Marathon County on April 10, 2019, alleging a misdemeanor charge of resisting or obstructing an officer. State v. Tallman, Case Number 2019CM648 (Marathon County Circuit Court), available at https://wcca.wicourts.gov/case.html. The plaintiff failed to appear for his initial appearance and was arrested; on June 3, 2019, he was brought to the Marathon County Jail. Id. Also on June 3, 2019, a criminal complaint was filed against the plaintiff in Marathon County on felony drug charges and misdemeanor bail jumping and drug possession. State v. Tallman, Case Number 2019CF581 (Marathon County Circuit Court), available at https://wcca.wicourts.gov/case.html. A third complaint was filed in Marathon County on June 7, 2019, on additional felony drug charges, felony bail jumping and misdemeanor charges. State v. Tallman, Case Number 2019CF598 (Marathon County Circuit Court), available at https://wcca.wicourts.gov/

case.html. The plaintiff had a review hearing on June 12, 2019 in all three Marathon County cases (19CM648, 19CF581 and 19CF598). While these cases proceeded, the plaintiff was held at Dodge on a DCC hold for Marathon County, where the various charges were pending. These three cases remain open, and several additional charges have been brought against the plaintiff in new complaints filed in Marathon County, most recently on November 15, 2023. The plaintiff has hearings scheduled on December 4 and 18, 2023 and February 27 and 28, 2024.

On November 25, 2019 (while the plaintiff was incarcerated at Dodge Correctional Institution), a complaint was filed against him in Dodge County Circuit Court. State v. Tallman, Case Number 2019CF351 (Dodge County Circuit Court), available at https://wcca.wicourts.gov/case.html. This complaint charged the plaintiff with "Prisoner Throw/Expel Bodily Substances," a felony. On March 25, 2020, the Dodge County Circuit Court found the plaintiff not competent to proceed, but on June 10, 2020, found that he was competent. The case concluded on February 23, 2023, when the plaintiff pleaded no contest and was sentenced to two years' probation. Id.

On July 21, 2020, the Marathon County Circuit Court held a competency hearing in cases 19CF581, 19CF598 and 19CM648, and found the plaintiff "incompetent [to proceed] but able to be restored to competency." The court ordered the plaintiff committed for one year "to restore competency" and suspended "further proceedings." This means that on July 24, 2020—the day of the events alleged in the complaint—the plaintiff was incarcerated at Dodge

Correctional Institution on a hold for the Marathon County charges filed against him while he was on extended supervision. He was not convicted of those charges and still has not been; his only conviction since 2017 was on February 23, 2023 for conduct that occurred while he was incarcerated and after the events alleged in the complaint.

It is not settled whether this "hybrid" form of detention—the plaintiff being held on a DCC hold at a prison for pending Marathon County charges brought while he was on extended supervision—requires the court to treat the plaintiff as a pretrial detainee or convicted person when analyzing his claims. See Estate of Clark v. Walker, 865 F.3d 544, 546 n.1 (7th Cir. 2017) (citing Hoyt v. Gilden, Case No. 15-cv-437-jdp, 2017 WL 90389, at *3 (W.D. Wis. Jan. 10, 2017)). The court will follow the lead of other courts in this district and the Western District of Wisconsin and will apply the more lenient Fourteenth Amendment standard to the plaintiff's claims.[4] See Ratliff v. Ramus, Case No. 20-CV-1823, 2022 WL 17976874, at *3 (E.D. Wis. Dec. 28, 2022) (citing Smith v. Sangamon Cnty. Sheriff's Dept., 715 F.3d 188, 191 (7th Cir. 2013); and Estate of Jeffery Nottestad v. LaCross County, Case No. 21-cv-535, 2022 WL 17583798, at *5 (W.D. Wis. Dec. 12, 2022)) (applying Fourteenth Amendment standard to claims by plaintiff who was in custody in violation of a probation hold).

---

[4] The resolution of the plaintiff's claims would be the same under the stricter Eighth Amendment standard, as the court discusses below. See infra, pp.28–29.

## C.    Fourteenth Amendment

Because the court is treating the plaintiff's claims as if he had been a pretrial detainee at the time of the alleged events, it must analyze them under the Fourteenth Amendment. See Hardeman v. Curran, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)). Under the Fourteenth Amendment, the plaintiff must show "that a defendant's conduct was 'objectively unreasonable.'" Kemp v. Fulton County, 27 F.4th 491, 495 (7th Cir. 2022) (quoting Hardeman, 933 F.3d at 824). This standard requires the court to analyze the plaintiff's claim based on its particular "facts and circumstances." Kingsley, 576 U.S. at 397 (quotation omitted).

To survive summary judgment, the plaintiff must present evidence showing that 1) "the 'defendant[] acted purposefully, knowingly, or perhaps even recklessly'" and 2) "the defendant['s] actions were [not] 'objectively reasonable.'" Pittman by & through Hamilton v. County of Madison, Ill., 970 F.3d 823, 827 (7th Cir. 2020) (quoting Miranda v. County of Lake, 900 F.3d 335, 353–54 (7th Cir. 2018)). Stated differently, the plaintiff must show that the defendant's actions were not "rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" Hardeman, 933 F.3d at 822 (quoting Kingsley, 576 U.S. at 398). Neither negligence, gross negligence nor medical malpractice amount to deliberate indifference. See Miranda v. County of Lake, 900 F.3d at 353.

The complaint alleged two forms of constitutional violations by the defendant. First, it alleged that the defendant's words and actions during the

July 24, 2020 medical appointment constituted sexual assault and harassment—in constitutional terms, a form of excessive force. Second, it alleged that the defendant exhibited deliberate indifference to the plaintiff's serious medical need when she had him returned to his cell without removing the staples from his fingers or providing him medical treatment.

D.   Excessive force

The Seventh Circuit has explained that "excessive force is not the only means by which a prisoner's civil rights can be violated . . . ." Washington v. Hively, 695 F.3d at 642. Although cases involving "excessive force" "usually mean rough or otherwise improper handling that causes excessive pain or other harm," "[a]n unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant." Id. at 643 (citations omitted). "Indeed, sexual offenses need not involve *any* touching—think of indecent exposure, voyeurism, and child pornography that does not depict sex acts." Id.

The undisputed evidence confirms most of what the plaintiff alleged in his complaint. The plaintiff's declaration in support of his opposition to summary judgment reiterates the complaint's allegations about Dr. Jeanpierre's conduct during the July 24, 2020 examination. The defendant supplied BWC videos of the examination, taken from the perspective of three officers present in the room

23

during the examination. The videos show the events and document the conversation between Dr. Jeanpierre and the plaintiff.[5]

The undisputed video evidence shows that while Dr. Jeanpierre attempts to examine the plaintiff's injured hand, she rubs the plaintiff's forehead and repeatedly rubs or scratches the plaintiff's jawline. She asks the plaintiff to look at her. When he does, she calls him "pretty brown eyes" and "pretty brown eyes boy." At one point she caresses or squeezes his left arm and comments about his muscles and how he must be working out. She rubs his left forearm and his right hand where the plaintiff has tattoos and asks what they mean. She holds the plaintiff's fingers and tells him that they are cold.

The plaintiff does not allege—and the videos do not show—Dr. Jeanpierre touching the plaintiff's genitalia. The plaintiff does not allege—and the videos do not show—that Dr. Jeanpierre made any overtly sexual remarks to the plaintiff, or that she referenced sex or genitals. There is no evidence that Dr. Jeanpierre indecently exposed herself or performed any acts of voyeurism. What the undisputed evidence shows is that Dr. Jeanpierre exhibited behavior that could be subject to different interpretations.

The plaintiff says that Dr. Jeanpierre's actions and words made him feel uncomfortable and humiliated. He asserts in his response to the defendant's

_____

[5] Because neither party questions the quality or authenticity of the video and audio of those exhibits, the court will disregard any version of the facts that is inconsistent with the video evidence. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

proposed findings of fact—though he did not allege as much in the complaint—that she engaged in those actions (squeezing his bicep, stroking his hand) and said those words (calling him "pretty brown eyes," making comments about his biceps and saying that he must be working out) with the intent of either humiliating him or gratifying her sexual desires. In contrast, Dr. Jeanpierre avers in her declaration that she intended her actions and words to gain the plaintiff's trust and compliance and to soothe and calm him so she could treat his injuries. She also avers that she knew the plaintiff had a history of self-harm.

The video evidence contains some support for Dr. Jeanpierre's description of her motivation for her actions. Her manner and tone of voice during the July 24, 2020 examination are those of someone trying to gently cajole a reluctant and unreceptive person into cooperating. At one point, the plaintiff appears to have perceived that this was what Dr. Jeanpierre was trying to do; he smiles, chuckles and says, "It's not going to work." That suggests not that the plaintiff believed he was being harassed or assaulted, but that the plaintiff understood that Dr. Jeanpierre was attempting to establish a rapport with him so that he would allow her to remove the staples from his hand. By responding, "It's not going to work," the plaintiff appears to have been acknowledging that Dr. Jeanpierre was using her words and actions to convince him to let her treat him, not to sexually humiliate him or gratify her own sexual desires.

The exchange between Dr. Jeanpierre and the lieutenant just after the appointment also supports Dr. Jeanpierre's description of her intent. When the lieutenant expressed concern that the plaintiff could have interpreted Dr. Jeanpierre's comments to be suggestive, sexual or otherwise in violation of the Prison Rape Elimination Act (PREA), Dr. Jeanpierre first responds with a surprised, "Oh!" before telling the lieutenant, "I didn't know that." Ex. 1003 at 7:12–7:18. She then tells the lieutenant that she is sorry. This exchange suggests that it did not occur to Dr. Jeanpierre that her actions and words could be construed as an attempt to humiliate the plaintiff, or to gratify herself sexually.

Finally, there are the logistics of the examination. Dr. Jeanpierre was not alone with the plaintiff during the examination. The examination took place in the restricted housing unit. Nurse Mueller was present, as were Adam Tank, Cole Gilmore and Audie Ritschke. It is unlikely that if Dr. Jeanpierre intended to sexually humiliate or assault the plaintiff, she would have done so in the presence of four other people. The plaintiff alleges only a single event—the July 24, 2020 examination—lasting around seven and a half minutes.

In <u>Holloway v. Doe</u>, Case No. 22-2717, 2023 WL 7412949, at *1 (7th Cir. Nov. 8, 2023), the plaintiff—a convicted person, not a pretrial detainee—alleged that a correctional officer sexually harassed or assaulted him in violation of the Eighth Amendment when he "'slapped [him] on [his] butt'" on one occasion. The district court dismissed the complaint, concluding it "'could not reasonably infer that a single slap on the butt amounts to sexual harassment.'" <u>Id.</u> The

district court gave the plaintiff permission to amend his complaint to explain whether the "'slap was intentional,' if the officer made comments, or if he interacted with [the plaintiff] before or after the incident." Id. The plaintiff amended his complaint but did not add those details. Id. The district court dismissed the amended complaint and the case, explaining that "it could not infer from the allegations that the officer struck [the plaintiff's] buttocks 'intentionally . . . let alone that he did so maliciously or sadistically or for sexual gratification.'" Id. The district court also concluded that "a single strike of the hand on the buttocks did not violate the Eighth Amendment." Id.

The Seventh Circuit affirmed the district court's dismissal of the amended complaint for failure to state a claim. Id. at *2. The appellate court began by explaining that to prove an Eighth Amendment claim (a more strict standard that the Fourteenth Amendment claim), the plaintiff must allege "that the defendant had a 'sufficiently culpable state of mind' and committed objectively 'harmful' conduct." Id. at 1 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). Regarding the first element—a "sufficiently culpable state of mind"—the court explained that the plaintiff had "to allege . . . that "the officer 'intended to humiliate the victim or gratify [his own] sexual desires.'" Id. at *1 (quoting Hively, 695 F.3d at 643 (emphasis added by the Seventh Circuit)). Because the amended complaint did not contain allegations that the slap was intentional, "or allege comments or other interactions from which intent to achieve sexual gratification could be inferred," the court concluded that the plaintiff had not alleged that the defendant had a sufficiently culpable state of

mind when he slapped the plaintiff's buttocks. Id. The court rejected the plaintiff's argument that the court should "presume an officer intends to gratify his sexual desires whenever he touches a private area without penological justification." Id. at *2.

As to the second element—objectively harmful conduct—the Seventh Circuit concluded that the force the plaintiff alleged "[was] not objectively 'harmful.'" Id. (quoting Hudson, 503 U.S. at 8). The court explained that "[n]ot 'every malevolent touch by a prison guard' violates the Eighth Amendment. The conduct must involve 'significant force,' *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012), or, if it the force is de minimis, it must be 'repugnant to the conscience of mankind[,]' *Hudson*, 503 U.S. at 10 . . . ." Id. The court concluded, "An isolated slap of a hand on clothed buttocks that causes no injury is not, by itself, cruel and unusual punishment under these standards." Id.

If on July 24, 2020 the plaintiff had been a convicted person rather than a pretrial detainee, the Eighth Amendment would have required him to show that Dr. Jeanpierre acted with a culpable state of mind—that she intended to humiliate him or gratify her own sexual desires—and that her words and actions were "repugnant to the conscience of mankind." Under that standard, the court would have been forced to conclude that the plaintiff failed to provide evidence sufficient to survive summary judgment on either element of the claim. The complaint did not allege that Dr. Jeanpierre intended to humiliate the plaintiff or to gratify her own sexual desires (the plaintiff did not make that

allegation until the summary judgment stage, and then only in a single sentence) and the video evidence and circumstances surrounding the examination do not support that conclusion. Nor is touching someone on the face or arm, telling the person that they have pretty, brown eyes or making admiring comments about their muscles "repugnant to the conscience of mankind."

The Fourteenth Amendment standard applicable to a pretrial detainee is less stringent. Under the Fourteenth Amendment, the plaintiff is not required to prove that the defendant knew the amount of force she used excessive. Kingsley, 576 U.S. at 396-97. Under the Fourteenth Amendment standard, the pretrial detainee must show that the defendant engaged in the physical acts of the pretrial detainee complains with a "purposeful, a knowing, or possibly a reckless state of mind." Id. at 396. But as to the defendant's knowledge about the degree of force used, "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." Id. A pretrial detainee may make that showing by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate government objective or that it is excessive in relation to that purpose." Id. at 398.

Dr. Jeanpierre intentionally and purposefully touched the plaintiff as she did, and used the words she did, during the July 24, 2020 examination. She does not deny that fact. But she has explained that her objective was to try to calm the plaintiff, gain his trust, establish empathy and build rapport so she

could convince him to let her take the staples out of his fingers. The video evidence and the circumstances support that explanation. Providing medical care to someone with staples through his fingers—particularly someone who was in enough pain to complain to a correctional officer but who had, over the course of several hours, refused to allow prison staff or ER staff to treat him—is a legitimate, nonpunitive government objective. Trying to soothe and calm that person so that a medical provider can remove the staples is rationally related to that legitimate purpose.

That leaves the question of whether a reasonable jury could conclude that Dr. Jeanpierre's words and actions—touching and rubbing the plaintiff's face and arm, calling him "pretty brown eyes" and commenting on his muscles—were "excessive in relation to" that legitimate purpose. See Hardeman, 933 F.3d at 822. The court concludes that no reasonable jury could make that finding. The plaintiff first told a member of the prison staff that he could not deal with the staples in his fingers at about 3:00 a.m. Over the next couple of hours, he allowed a nurse to clean the fingers but would not allow the staples to be removed. The prison transported the plaintiff offsite to an emergency room, where he again refused treatment. At 6:05 a.m.—three hours after the plaintiff's initial complaint to the corrections officer—another nurse saw him, but he still refused to allow the staples to be removed. By the time Nurse Mueller and Dr. Jeanpierre saw him, the staples had been in the plaintiff's fingers for at least three and a half hours, and he'd refused every opportunity to have them removed.

Dr. Jeanpierre tried touch, and what she perceived as comforting and encouraging language, to accomplish what no one in the prior several hours had accomplished—to convince the plaintiff to let her remove the staples. Although that approach was awkward and subject to misinterpretation, it was not "excessive in relation to" her legitimate, nonpunitive government interest in removing the staples and preventing infection. Dr. Jeanpierre interspersed the compliments and comments with encouragement to the plaintiff to show her his hand so she could treat his injuries. She explained why he should allow her to treat him and not leave the staples in his hand. She assured him that she and the nurse were not trying to trick him, and she asked him to allow her to remove at least one of the staples once she'd been able to get a closer look.

The plaintiff has asserted that Dr. Jeanpierre's physical contacts and her words made him uncomfortable. But the Seventh Circuit has held that "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." Beal v. Foster, 803 F.3d 356, 358 (7th Cir. 2015). While some verbal harassment can rise to the level of a constitutional violation—imagine, for example, a correctional officer who tells "an inmate with a severe headache that the doctor had told the officer that the inmate actually had terminal brain cancer," Lisle v. Welborn, 933 F.3d 705, 718 (7th Cir. 2019) (citing Beal, 803 F.3d at 357)—a reasonable jury could not conclude that Dr. Jeanpierre's statements were so excessive in relation to her goal of removing the staples that they rose to the level of a constitutional violation. The same is true of her acts in touching his face and his arms.

Case 2:22-cv-00994-PP   Filed 11/29/23   Page 31 of 36   Document 33

One might question Dr. Jeanpierre's judgment in taking the approach that she took. In a carceral setting, working with a patient whom she knew had a history of self-harm, it arguably should not have been a surprise to Dr. Jeanpierre that the plaintiff might perceive her actions and words as sexually motivated. Self-harm often is the result of mental illness, and "staff of an institution that houses and treats persons suffering from mental disorders should be held to understand that they are dealing with psychologically impaired persons." Hughes v. Scott, 816 F.3d 955, 957 (7th Cir. 2016). But at best, Dr. Jeanpierre's error in judgment and failure to perceive the risk that the plaintiff might misinterpret her conduct amounts to negligence. Negligence—even gross negligence—is not enough to violate the Fourteenth Amendment. See Miranda, 900 F.3d at 353.

The court understands how the plaintiff might have found Dr. Jeanpierre's actions and words confusing and uncomfortable. Even the lieutenant warned Dr. Jeanpierre that someone could perceive her words and conduct as having a sexual component, and the plaintiff viewed her conduct through the lens of his own mental struggles. But the evidence does not support a finding that Dr. Jeanpierre's actions were excessive in relation to the legitimate, nonpunitive purpose of treating the plaintiff's self-inflicted injuries. Her conduct may have been inappropriate or even unprofessional, but a reasonable jury could not conclude that it went so far as to constitute sexual harassment or abuse in violation of the plaintiff's rights. The court concludes

that Dr. Jeanpierre is entitled to judgment as a matter of law on the plaintiff's Fourteenth Amendment claim.

E.    Deliberate Indifference

The defendant spills considerable ink contesting an Eighth Amendment claim of deliberate indifference based on Dr. Jeanpierre's failure to provide the plaintiff medical care and remove the staples on July 24, 2020. Dkt. No. 18 at 2–9. Part of that discussion includes an argument that Dr. Jeanpierre is entitled to qualified immunity.[6] Id. at 6–9.

Although the court's screening order acknowledged that the plaintiff had alleged that Dr. Jeanpierre "was deliberately indifferent to his serious medical need," dkt. no. 9 at 4, the court failed to analyze that claim (under either the Eighth or the Fourteenth Amendment standard). The court did not specially authorize the plaintiff to proceed on a deliberate-indifference-to-medical-need claim, nor did it prohibit him from doing so. In his brief in opposition to the summary judgment motion, the plaintiff did not defend the purported deliberate indifference claim, asserting only that "Plaintiff is sueing [*sic*] because he was touched, grabbed, and talked to in a way that is in violation of his civil rights." Dkt. No. 28 at 3. He did not discuss an Eighth or Fourteenth Amendment claim that Dr. Jeanpierre violated his rights when she failed to

---

[6] The defendant did not raise a qualified immunity defense to the plaintiff's claim that Dr. Jeanpierre sexually assaulted or sexually harassed him, and she does not address that affirmative defense in the section of her brief dedicated to that claim. Dkt. No. 18 at 9–12. Because the court has concluded that the defendant is entitled to summary judgment on the merits of the excessive force claim, it need not analyze whether the qualified immunity defense would have applied to that claim.

provide him treatment for his injured hand. Because the parties (at least the defendant) may have misinterpreted the screening order as allowing the plaintiff to proceed on a claim of deliberate indifference, the court provides the following analysis.

The court analyzes the plaintiff's claim of deliberate indifference under the same Fourteenth Amendment standard described above. See Miranda, 900 F.3d at 352; Pittman, 970 F.3d at 827. The court finds that Dr. Jeanpierre would be entitled to summary judgment on a putative claim of deliberate indifference. The evidence shows that the plaintiff had refused medical treatment from two nurses and from staff at a nearby emergency department before Dr. Jeanpierre saw him. The plaintiff has not contested the evidence that he repeatedly refused medical care. The video evidence shows the plaintiff refusing to allow Nurse Mueller to remove the staples from his hand and treat his injuries before Dr. Jeanpierre intervenes. He remained steadfast in that refusal through the remainder of the medical examination.

The evidence shows that Dr. Jeanpierre did not refuse to treat the plaintiff; it shows that *the plaintiff* refused to allow *Dr. Jeanpierre* (or anyone else) to treat him. No reasonable jury could conclude that Dr. Jeanpierre's decision not to force medical care on an unwilling patient for a non-life-threatening medical need was objectively unreasonable. See Hahn v. Walsh, 915 F. Supp. 2d 925, 953 (C.D. Ill. 2013), aff'd, 762 F.3d 617 (7th Cir. 2014) (citing cases for the proposition that "a plaintiff cannot refuse treatment . . . and then complain that defendants were deliberately indifferent to (her)

medical . . . needs") (quotation omitted); <u>Estate of Swayzer v. Milwaukee County</u>, Case No. 16-CV-1703-BHL, 2022 WL 656884, at *16 (E.D. Wis. Mar. 4, 2022) (granting summary judgment for psychiatrist who repeatedly but unsuccessfully attempted to treat mentally ill pretrial detainee, but detainee refused and rebuffed her efforts).[7]

F.    <u>State Law Claims</u>

The court permitted the plaintiff to proceed on state-law claims of negligence and medical malpractice. Dkt. No. 9 at 7. The court explained that it would exercise supplemental jurisdiction over those claims because they were related to the plaintiff's federal claim. <u>Id.</u> (citing 28 U.S.C. §1367(a)). The court has concluded that Dr. Jeanpierre is entitled to judgment as a matter of law on the plaintiff's federal claims. The court will relinquish supplemental jurisdiction over the state-law claims. <u>See</u> 28 U.S.C. §1367(c)(3). The plaintiff may raise those claims in state court, subject to the statute of limitations.

## III.    Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 17.

The court **DISMISSES** this case. The clerk will enter judgment accordingly. This order and the judgment to follow are final. A dissatisfied party

---

[7] The defendant argued that if the court declined to grant summary judgment in her favor, she was entitled to qualified immunity. "Where a defendant 'wins on the facts, [she] does not need qualified immunity." <u>Sierra-Lopez v. County</u>, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting <u>Viero v. Bufano</u>, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and <u>Antepenko v. Domrois</u>, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of November, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**